### R. F. Parker v. The State.

No. 5430.    Decided November 12, 1919.

**1.—Murder—Provoking Difficulty—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue of provoking the difficulty, the court properly submitted a charge on this phase of the case.

**2.—Same—Evidence—Bill of Exceptions—Rule Stated.**

A bill of exceptions must not only state the ground of objection, but must go further and contain such matter as will make apparent the injury claimed from the recitals of the bill itself, and where this is not done the same will not be considered on appeal.

**3.—Same—Absent Witness—Evidence—Practice in District Court.**

Where no effort was made to connect the defendant with the failure of an absent witness to appear, the State should not have been permitted to place in evidence the application for process of said absent witness. Following: Funk v. State, 208 S. W. Rep., 508.

**4.—Same—Collateral Matters—Evidence—Rebuttal.**

Where, upon trial of murder, it appeared from the evidence that the homicide occurred as the result of a statement made by the deceased that the defendant had been intimate with a certain woman at a certain time and place, there was no error in admitting testimony that such was the fact. But the defense should have been permitted to show the bias of the witness who gave this testimony.

**5.—Same—Hearsay Evidence.**

Upon trial of murder, the conversation between third parties, out of the presence and hearing of defendant, should not have been admitted in evidence, although this may have followed a question by the defendant which had been withdrawn before the same was answered.

**6.—Same—Evidence—Other Transactions.**

Where the homicide was the result of a statement by deceased that another party had told him that the defendant and a woman had been found in a compromising situation at a certain time and place, there was no error in admitting testimony that tracks and other evidence of the presence there of other men and women had been found at such place.

**7.—Same—Evidence—Threats by Deceased.**

Upon trial of murder, the court should have admitted testimony to the effect that a short time before the homicide he saw and heard deceased point through a door evidently at defendant, making threats against him at the time.

Appeal from the District Court of Van Zandt. Tried below before the Hon. Joel R. Bond, judge.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Wynne, Wynne & Gilmore,* for appellant.—On question of provoking difficulty: Edwards v. State, 60 Texas Crim. Rep., 323, 131 S. W. Rep., 1078; Smith v. State, 87 id., 151; Lockhart v. State, 53 Texas Crim. Rep., 589.

On question of admitting application for continuance for absent witness: Funk v. State, 208 S. W. Rep., 509; Barnes v. State, 61 Texas Crim. Rep., 37, 133 S. W. Rep., 887; Askew v. State, 59 Texas Crim.

Rep., 152, 127 S. W. Rep., 1037; Maines v. State, 23 Texas Crim. App., 568; Askew v. State, 59 Texas Crim. Rep., 152.

On question of admitting testimony of prior misconduct on part of defendant; Parker v. State, 81 Texas Crim. Rep., 397, 196 S. W. Rep., 537.

On question of showing bias of witness: Zarafonetis v. State, 82 Texas Crim. Rep., 120, 198 S. W. Rep., 938; Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611; Green v. State, 54 Texas Crim. Rep., 3, 111 S. W. Rep., 933.

*E. A. Berry,* Assistant Attorney General, for the State.

LATTIMORE, Judge.—Appellant was convicted in the District Court of Van Zandt County for the murder of Warren McWilliams, and his punishment fixed at five years in the penitentiary.

Deceased was a barber; appellant was constable of the precinct. There is abundant proof of enmity between the two men; threats of each against the other were in evidence, and many witnesses testified to strongly abusive language used by deceased concerning appellant, much of which is shown to have been communicated to him.

The immediate circumstances antecedent to the homicide, make it appear that one Downing and appellant, as claimed by the State, were out on the Sunday night preceding the killing on Wednesday, in a pasture or meadow, with a woman named Lottie Carpenter, who had been staying at the county farm, and with whom, if the State's testimony is believed, appellant indulged in reprehensible conduct on said occasion. The county farm was supervised by Henry Blackwell, Jr., commonly called "Little Henry Blackwell." Deceased went by the name of Happy McWilliams, and it appears that the Carpenter woman was red-headed.

Immediately after the occasion of being out with the woman, testified to by the witness Downing, it began to be talked in the town of Canton that the constable was out at night with a red-headed woman. Several witnesses swore that the deceased made this statement to them. Romey Mathis testified that on the morning of the killing, deceased told him that they had caught old Bob (meaning appellant) out with a woman, "and he wanted me to tell everybody I saw. . . . He said he wanted to do everything except advertise it in the newspaper, and for me to tell everybody I saw in Canton. I believe he called him a 'son of a b—! . . . When Bob (deceased) rode through town, Warren said "There goes a damned son of a b— or something like that; have heard him whistle at him and curse him."

Andrew Haynes testified that on the morning of the killing he met deceased in the meat market, and deceased asked him if he had heard the latest, and witness replied, "What is it?" Deceased said, "We

have got our constable into it." Witness asked him what it was, and deceased replied that they had him tangled up with a red-headed woman, and the witness stated to deceased that he had better be careful, but deceased said they had the right man; that Henry Blackwell had just told him, and he further stated that he would advertise it in the newspaper if he could; that he was going to keep on advertising the transaction between Bob and the woman just as far as he could. There is much more of the same sort of testimony in the record, but the above illustrates the attitude of deceased toward appellant.

It was proven by the State that appellant had said that if deceased ever started at him he was going to shoot him; and that appellant said a short time before the fatal difficulty, that if deceased didn't quit talking about him he was going to shoot him. The sheriff of the county testified that deceased was about twenty-eight years old and weighed over two hundred pounds; that appellant was fifty years old, and weighed about one hundred and thirty pounds; that on one occasion he heard appellant say that if deceased did not quit fooling with him he was going to shoot part of his anatomy off. Other witnesses testified that he told them that he was going to shoot deceased if he didn't let him alone.

Getting down to the immediate cause of the killing, Cyrus Walker swore that on that day appellant came to him and asked him who it was that had been telling it around that he had been out with that woman. Witness said: "I told him that was all right, and he said, "who told you?" and I said, 'Little Henry Blackwell told the guy that told me;' and he put his hand in his pocket and said: 'By God, tell me!' I said 'Warren McWilliams told me.' "

It further appears from the testimony of other witnesses that appellat made search for Henry Blackwell, but failed to find him, and then went in search of deceased.

The killing occurred in a restaurant. The proprietor, who was an eyewitness, stated that deceased had come into his place of business, ordered food, and was eating. when appellant walked in and approached deceased, and said, "Hap, who says I was out with a woman Sunday night?" and Warren said, "Little Henry Blackwell"—I believe that's what he said—and Bob Parker said, "Whoever says it is a damned liar and a son of a b—' and Warren said 'Little Henry Blackwell told me about it,' and I think Bob repeated what he had said and Warren said 'You don't want to be coming at me with that, and said 'Little Henry Blackwell. told me and I'm just repeating what he said; you tell him that and he will whip you,' and Bob said, 'That's more than you or any one else will do' and by that time Warren got up and something was said about 'phoning Henry Blackwell; Warren said something about 'well, 'phone little Henry Blackwell;' " when Warren said that, I believe he had sat down again and

Bob had started out the door and he came back and said, 'Who told Henry Blackwell this?'' and Warren said "He saw you, I guess; he said he did" and Bob said, ''Well, he is a damned lying son of a b—,'' and Warren said, "He would whip you if you would tell him that," and Bob says, "That's more than you or anybody else in this town can do;'' then they spoke of 'phoning little Henry Blackwell—I don't just know what was said—and Warren told him if he would take the gun off he would show him; said he didn't know but what he could do it anyhow. Bob was, at that time, on the east side of the east corner; he was back a little southeast of the north counter; he was right here (indicating with pencil); Bob was sorter southeast of the east end of the north counter—about two feet southeast; in the meantime, Warren was standing up and was walking up toward the front north counter; he was walking north and facing north. Yes, Bob was sorter east of him; he was east of him part of the time. When Warren jumped up on the north counter, it was just like a man would jump over it, this way (Witness jumps upon table and shows the jury the position of Warren McWilliams on the north counter); and Bob was standing back this way (indicating) kinder east, maybe southeast. Parker fired two shots and it seems like Warren was in the position as indicated when the first shot was fired, the shots were fired as fast as a gun can shoot; after the shots were fired, Warren McWilliams ''slid'' off the counter to the north and went out the door.''

The witness Dubose, who was in the restaurant, and an eyewitness, testified as follows: ''Bob Parker asked if he had told that he was out with a woman the night before; before Bob Parker asked that, Warren had not said anything to him. Warren replied that he had told it, and Bob asked him who had told him and he told Bob that Little Henry Blackwell had told him, and Bob then said that any one who said that he was out with a woman was a 'damned lying son of a b—'; McWilliams got up and said 'You don't mean to call me that, do you?' In the meantime, I had gone around the west end of the west counter and the north end of the north counter and was standing near Bob; it was 'kinder' agreed that they should go and telephone Henry if there was any doubt about it; McWilliams suggested 'phoning—said that if he (Bob) didn't believe him to go and 'phone Henry; McWilliams was standing up there—or perhaps he had sat down; I don't really know whether he was standing up or sitting on the stool, he was near the stool. When I came around there, it seemed they were going to have some trouble and I told Bob I wouldn't do that; I caught him by the right hand, he had his right hand about half-way in his pocket and I saw a pistol; Warren was standing on the west side: I don't know whether Warren could see the pistol or not; it could have been that he could not have seen it on account of Bob not

having it far enough out of his pocket. I just saw it like that (indicating.) Parker told me to go and 'tend to my own business and I turned and walked to the door. It seems that they agreed on calling Little Henry Blackwell up and seeing about it; I thought it was all over with and Bob followed me to the east end of the north counter and I walked out almost to the north door; Bob stopped there; I don't remember who said the first word after Bob stopped; I do remember that something was said about going and 'phoning to Henry, and Bob said 'Well, if Henry Blackwell said that or anybody else—if anybody said it—they are a damned lying son-of-a-b—' and Warren told him that he had better not tell Little Henry Blackwell or anybody else could do, and by that time McWilliams had walked to the south side of the north counter and was standing with his hands on the counter while they were talking and when Bob Parker told him ''that's more than you or anybody else can do,'' Warren said if he would lay that gun off he would show him, or if he didn't have a gun, or something like that; and he said that he didn't know but what he could do it anyhow, or something to that effect. Bob was at that time about five feet, I suppose, from Warren McWilliams. Warren got up on the south side of the north counter facing north; he was facing north when the shot was fired; both of Warren's hands were on the counter; his feet were west and his hands east; he did not have anything in his hands; Warren was in that position when both shots were fired.''

The trial court charged on provoking the difficulty, which charge was excepted to and here complained of. No exception was taken to the manner and form of said charge, the only complaint being that there was no evidence authorizing the same. We cannot sustain this objection. It plainly appears from the evidence just quoted that appellant went armed to where deceased was, and repeatedly applied to the persons who had told of his being out with a woman the most insulting epithets known to the Anglo Saxon—and this after deceased had stated that he was the one who had told it. After appellant had repeated this epithet, and use other language and gestures, deceased started over the counter toward appellant, who thereupon shot him twice. Whether in fact the things said and done by appellant on that occasion were for the purpose of provoking such an attack, and using the same as a pretext for the killing—were questions for the jury under appropriate instructions.

We see nothing in the bills of exception to the testimony of Fred Covert that he smelled whisky on appellant's breath on the day of the homicide. The ground of the objection, as stated, is, that same was immaterial, irrelevant, and highly inflammatory to appellant. This presents nothing by which we may be informed that injury resulted. For aught shown in the bill. the evidence might have been very material, pertinent, and advantageous to the appellant. A bill

of exceptions must not only state the ground of objection, but must go further and contain such matter as will make apparent the injury claimed, from the recitals of the bill itself. What we have just stated applies to appellant's bill of exceptions No. 4, to the testimony of John Anderson.

The State was permitted, over objection, to show that the woman with whom appellant was supposed to have been out on the night in question, was not present at the trial, and to place in evidence the application of the State for process for said woman, issued to Van Zandt County, and also to Dallas County, and the return of the officer on said process, showing that said witness could not be found. No effort was made to connect appellant with the failure of said witness to appear. The introduction of this evidence was erroneous, as was held by this Court in Funk v. State, 85 Texas Crim. Rep., 527, 208 S. W. Rep., 508, and authorities cited.

We think the evidence of the witness Downing, showing in fact that appellant was out with the woman, on the Sunday night preceding the killing, their conduct with each other that night, was admissible, as shedding light on the frame of mind of appellant at the time of the commission of the homicide. Inasmuch as this case must be reversed for other errors, we observe that appellant should have been allowed to ask the witness Downing as to his friendship toward deceased, and their relations to each other, and any other questions fairly calculated to elicit matter which might throw light on the motive of the witness for testifying. It was a sharply contested issue as to whether or not appellant was in fact out with the woman on said date, and Downing was the only witness who testified to such fact.

The conversation of said witness Downing with Joe Lawler, out of the presence and hearing of appellant, should not have been admitted. That appellant asked a question of said witness Downing, which might have elicited said matters, but which question was withdrawn before the same was answered, was no reason for permitting the State to bring out such hearsay testimony over objection.

The evidence of Henry Blackwell, Jr., was properly admitted, to the effect that he and others went down into Mrs. Smith's pasture and there saw the tracks of men and women, cigar stubs, etc. This is corroborative of the State's claim that appellant was at said place with the woman.

The evidence of the witness Slaughter to the effect that a short time before the homicide he saw and heard deceased point through a door and say "There goes a man I am going to shoot a hole through. I will put his light out," was admissible, and should have been received. The fact that no name was used by the deceased could only affect the weight of the testimony; the witness said that when deceased made the statement, he looked through the door, and saw no one except the appellant. If the surrounding circumstances reason-

ably indicated that appellant was the subject of the remark of the deceased, the jury were entitled to have the benefit of the statement for what it was worth.

The other errors complained of will likely not occur on another trial, and we will not discuss them.

For the errors pointed out, the cause is reversed and remanded for another trial.

*Reversed and remanded.*